United States District Court
Southern District of Texas
**ENTERED**
August 05, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| JEWELL THOMAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00083 |
| | § | |
| ISAAC KWARTENG, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION
TO RETAIN CASE AND TO DISMISS CERTAIN CLAIMS**

Plaintiff Jewell Thomas, appearing *pro se*, has filed this prisoner civil rights action

pursuant to 42 U.S.C. § 1983. Plaintiff asserts claims against Defendants under the Eighth

Amendment, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(A), and the

Rehabilitation Act (RA), 29 U.S.C. § 794. On May 31, 2022, Plaintiff paid the $402.00 filing

fee. Plaintiff's case is subject to screening pursuant to the Prison Litigation Reform Act. *See* 42

U.S.C. § 1997e(c); 28 U.S.C. § 1915A.

Plaintiff has stated, for purposes of screening: (1) Eighth Amendment deliberate

indifference claims against **Dr. Isaac Kwarteng** in his individual capacity with regard to

Plaintiff's move to housing located the second floor of his confinement facility in contravention

of his ground floor housing restriction; and (2) ADA/RA claims against the **State of Texas** and

**Dr. Isaac Kwarteng, Senior Warden Jerry Sanchez,** and **Bryan Collier** in their official

capacities with regard to Plaintiff's move to the second floor. Accordingly, it is recommended

that these claims be **RETAINED**. The undersigned will order service on Defendants.

For the reasons set forth below, the undersigned recommends further that: (1) Plaintiff's §

1983 claims for money damages against **Dr. Isaac Kwarteng, Senior Warden Jerry Sanchez,**

and **Bryan Collier** in their official capacities be **DISMISSED** as barred by the Eleventh
Amendment; and (2) Plaintiff's remaining § 1983 and ADA/RA claims against Defendants be
**DISMISSED with prejudice** as frivolous and/or for failure to state a claim for relief.

### A. Jurisdiction.

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This case has
been referred to the undersigned magistrate judge for case management and making
recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

### B. Background.

#### 1. Plaintiff's present § 1983 action.

Plaintiff filed this civil rights action on April 4, 2022.  (Doc. No. 1.)  Plaintiff is a
prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-
CID) and is housed at the McConnell Unit in Beeville, Texas.  Plaintiff's allegations in this case
arise in connection with his current housing assignment.  In this action, Plaintiff sues the
following defendants: (1) Medical Director Dr. Isaac Kwarteng (Dr. Kwarteng); (2) Senior
Warden Jerry Sanchez (Sanchez); (3) the State of Texas; and (4) TDCJ Executive Director Bryan
Collier (Collier).  With respect to Plaintiff's Eighth Amendment and ADA/RA claims, Plaintiff
seeks monetary relief.

#### 2. The June 21, 2022 Spears hearing.

On June 21, 2022, the undersigned conducted a *Spears*[1] hearing, in which Plaintiff was
given an opportunity to explain his claims.  The following representations were made either in
Plaintiff's Original Complaint (Doc. No. 1) or at the *Spears* hearing.

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

At the time of the *Spears* hearing, Plaintiff had recently turned 50 years old.  He is 6'0"
tall and weighs 213 pounds.  Plaintiff arrived at the McConnell Unit on October 1, 2021.  (Doc.
No. 27, pp. 7-8.)  Plaintiff suffers from chronic pain syndrome stemming from a lateral pelvic
tilt.  (Doc. No. 27, p. 9.)  Plaintiff also suffers from pain in his hip, lower left leg, and ankle
related to a previous accident in 1996 and subsequent surgeries.  *Id.* at 9-11.  These conditions
impact Plaintiff's ability to sit, stand, and walk even short distances.  *Id.* at 11-12.  On a scale of
one to ten, with ten being the worst pain, Plaintiff testified that his pain level is eight after
walking 25 feet.  *Id.* at 12.

Prior to December 2021, Plaintiff had been granted the following housing, work, and
medical restrictions while in TDCJ custody: (1) no work in humidity or temperature extremes;
(2) no work in direct sunlight; (3) no work involving climbing; (4) sedentary work only; (5) no
work around machinery with moving parts; (6) no food service; (7) housing on ground floor
only; (8) no lifting; (9) limited standing; (10) no repetitive squatting; (11) no walking on wet or
uneven surfaces; and (12) lower bunk assignment only.  (Doc. No. 27, pp. 13-15.)  On June 24,
2021, while Plaintiff was assigned to the Tennessee Colony Unit, a medical provider named
Robin Johnson set Plaintiff's ground floor restriction.  *Id.* at 16-17.

In November 2021, Dr. Kwarteng prescribed Plaintiff an anti-anxiety drug known as
Cymbalta.  (Doc. No. 27, p. 50.)  According to Plaintiff, he was not supposed to be taking anti-
anxiety medications due to the nature of the adverse side effects when taken in combination with
Naproxen and Aspirin.  *Id.* at 49-50.  After taking Cymbalta, Plaintiff experienced adverse
reactions from the drug, consisting of shaking, anxiety, nervousness, and nightmares.  *Id.*

On December 28, 2021, Plaintiff met with Dr. Kwarteng for a scheduled clinic
appointment.  (Doc. No. 1, p. 4.)  Plaintiff testified at the *Spears* hearing that the reason for the

appointment related to his chronic pain and need for physical therapy.  (Doc. No. 27, p. 18.)  Dr. Kwarteng did not provide Plaintiff any treatment that day and instead referred Plaintiff to physical therapy.  *Id.* at 18, 33-34.  Plaintiff believes that Dr. Kwarteng should have provided some type of treatment, such as pain management, pending the referral.  *Id.* at 33-34.

On December 29, 2021, Plaintiff was informed that he had to move from his ground floor cell to a cell on the second floor.  *Id.* at 18-19.  Plaintiff indicated in his Original Complaint that Dr. Kwarteng had issued the order for Plaintiff to be moved.  (Doc. No. 1, p. 4.)  In his *Spears* hearing testimony, Plaintiff stated that Dr. Kwarteng told Plaintiff that he did not issue the order, but Plaintiff remained suspicious that Dr. Kwarteng did in fact issue the order.  (Doc. No. 27, pp. 18-19.)  Plaintiff stated that he was not provided a written order indicating that Dr. Kwarteng had authorized the move to the second floor.  *Id.* at 22-23.  Later in his testimony, Plaintiff indicated that one of Dr. Kwarteng's subordinates, identified as "Dr. Echavarry," modified Plaintiff's restrictions on December 30, 2021 to "ground floor only," but that Dr. Echavarry failed to notify security about the updated restrictions.  *Id.* at 52-53.

According to Plaintiff, Dr. Kwarteng had the decision-making authority to move Plaintiff to another floor based on his medical conditions.  (Doc. No. 27, p. 19.)  Moreover, Plaintiff contends, Dr. Kwarteng was aware at that time of all of Plaintiff's medical restrictions and conditions, including his ground-floor-only restriction.  *Id.*  When Plaintiff was ordered moved from the ground floor, Dr. Kwarteng did not add or delete from Plaintiff's restrictions list.  *Id.* at 19-20.

Plaintiff complained to a McConnell Unit supervisory official identified as Captain Pawley regarding the order for him to move.  (Doc. No. 27, pp. 20-21.)  Sanchez was present and listened to Plaintiff's conversation with Capt. Pawley.  *Id.* at 54.  Plaintiff states that he showed

Capt. Pawley his current restrictions list and explained to him that he was being moved to the second floor for no apparent reason and against his restrictions list. *Id.* at 21. Capt. Pawley informed Plaintiff that he had the following two choices: (1) comply with the order to move and submit a sick call request to medical for the purpose of updating his restrictions list to reflect ground floor only; or (2) refuse the order, which would lead to a disciplinary action against Plaintiff. *Id.* at 21-22. Plaintiff states that he elected the first option. *Id.* at 22.

Plaintiff states that he filed a grievance complaining about his housing reassignment on December 30, 2021, one day after he was moved. (Doc. No. 27, pp. 26-27). Plaintiff testified that he was moved from the ground floor of Building 18 to the second floor of Building 3. *Id.* at 30-31. Plaintiff received a response 30 to 45 days later, around February. *Id.* at 27-28.

Plaintiff states that he had been complaining to medical officials for weeks before December 28, 2021, about weakness and extreme pain in his leg. (Doc. No. 27, pp. 31-32.) Because Plaintiff lived on the ground floor at that time, he did not cite any failure to navigate the stairs. *Id.* at 32. Once he was moved on December 29, 2021, Plaintiff submitted sick call requests to medical. *Id.* Plaintiff, however, was not seen by Dr. Kwarteng between December 29, 2021 and January 4, 2022. *Id.* at 32-33. Plaintiff indicated that physical therapy helped him to navigate the stairs, but that he had not received any such therapy since he "came into the system." *Id.* at 34.

On the night of January 4, 2022, Plaintiff left his cell so that he could watch television and socialize in the "day room," which was located downstairs on the ground level. (Doc. No. 27, pp. 35-36). Plaintiff testified that his left leg gave out, causing him to fall down the stairs. On the way down, Plaintiff testified, he hit his head, back, hip, lower leg, ankle, and foot. *Id.* at 36, 39. Although not breaking any bones, Plaintiff sprained his foot and ankle on the same leg

where he had lost several inches of bone following surgery resulting from his 1996 accident. *Id.* at 37-38. Plaintiff testified that he did not lose consciousness, but did incur a bump on his head. *Id.* at 38. Plaintiff's fall down the stairs was witnessed by several inmates, he states. *Id.* at 38-39.

Several correctional officers attended to Plaintiff immediately after the fall and called medical. (Doc. No. 27, p. 40.) The medical staff arrived, lifted Plaintiff off the floor onto a stretcher, and brought him to the medical department. *Id.* The medical personnel observed Plaintiff's left leg as very swollen. *Id.* at 41. While in the McConnell Unit's medical department, the medical personnel started an IV and wrapped Plaintiff's leg with a soft cast-type bandage. *Id.* at 42. An ambulance was called, and Plaintiff was transported to the nearby hospital's emergency room. *Id.* at 41. A physician at the hospital saw Plaintiff, and he received morphine and an orthopedic boot. *Id.* In addition, X-rays and a CAT scan were performed on Plaintiff. *Id.*

Plaintiff remained in the emergency room for 12 to 16 hours. (Doc. No. 27, p. 41.) When Plaintiff returned to the McConnell Unit, he was returned to a ground floor cell. *Id.* at 43. However, Plaintiff's ground floor cell was located in Building 12, which is restrictive housing.[2] *Id.* at 44. As a resident in restrictive housing, it was necessary for Plaintiff to have a correctional officer escort him anytime he had to go somewhere. *Id.* Plaintiff also had no access to a television or telephone. *Id.* at 45.

---

[2] At the *Spears* hearing, the undersigned asked Plaintiff what he meant by the term "restrictive housing." (Doc. No. 27, p. 44.) Plaintiff responded that restrictive housing consists of more stringent restrictions. *Id.* For example, "an escort is normally required . . . [a]ny time you go somewhere." *Id.* Plaintiff explained that you must have a correctional officer escort you to go anywhere—whether it be to "go to Medical" or to receive meals. *Id.* Plaintiff contrasted this restrictive housing with his previous housing, which he dubbed the "Holiday Inn"— a building with privileges. *Id.* at 30, 44-45.

Plaintiff testified that he did not know why he was placed in restrictive housing, as he had not received any disciplinary action.  (Doc. No. 27, pp. 45-47.)  Plaintiff acknowledged that Building 12 was also used to house transient inmates until new housing was found.  *Id.* at 47. After living in Building 12 for three weeks, Plaintiff states, he was moved to a ground floor cell in Building 4, which was a similar living situation to living on the ground floor in Building 3.  *Id.* at 45.  Plaintiff testified that, as of the day of the *Spears* hearing, he remains in pain from the fall and that his swelling has not gone down.  *Id.* at 43.

With respect to his Eighth Amendment and ADA/RA claims, Plaintiff sues Dr. Kwarteng in his individual and official capacities.  (Doc. No. 27, p. 52.)  Plaintiff states that Dr. Kwarteng acted with deliberate indifference to his serious medical needs by failing to perform a complete examination on Plaintiff on December 28, 2021, despite knowing about Plaintiff's physical conditions arising from his chronic pain and lateral pelvic tilt.  *Id.* at 51.  Plaintiff holds Dr. Kwarteng responsible for not preventing his move to the second floor and instead, deliberately turning "a blind eye."  *Id.*  Plaintiff also blames Dr. Kwarteng for following policy and prescribing him "what the rule book says for him to prescribe [Plaintiff]."  *Id.* at 52.

With respect to his Eighth Amendment and ADA/RA claims, Plaintiff sues Sanchez in his individual and official capacities.  (Doc. No. 27, p. 55.)  Plaintiff holds Sanchez responsible as a supervisory official for failing to: (1) take "ownership of the entire situation" upon hearing Plaintiff's conversation with Capt. Pawley; and (2) take responsibility for Plaintiff's housing assignment.  *Id.* at 54-55.

Plaintiff sues TDCJ Executive Director Collier in his official capacity, claiming that this defendant violated his ADA/RA rights.  *Id.* at 56.  Additionally, Plaintiff named the State of Texas as a defendant in his original complaint.  (Doc. No. 1, pp. 1, 3.)  When asked at the *Spears*

hearing if he intended to sue the State of Texas in addition to Collier, Plaintiff responded: "Well, yes and no." (Doc. No. 27, p. 57.) Plaintiff explained at first that Collier represents the public entity and is considered the state. *Id.* Plaintiff further explained, in a somewhat confusing manner, that Collier is not the state and is instead representing the state. *Id.* Last, Plaintiff seeks monetary relief in the form of compensatory and punitive damages. *Id.* at 58.

### C. *Legal standard.*

The Prison Litigation Reform Act provides that any prisoner action brought under federal law must be dismissed if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 42 U.S.C. § 1997e(c); *see also* 28 U.S.C. § 1915A. In this case, Plaintiff's action is subject to screening regardless of whether he prepays the entire filing fee or proceeds as a pauper. *See, e.g.*, *Ruiz v. United States*, 160 F.3d 273, 274 (5th Cir. 1998) (*per curiam*); *Martin v. Scott*, 156 F.3d 578, 579-580 (5th Cir. 1998) (*per curiam*). A claim is frivolous if it has no arguable basis in law or fact. *Neitzke v. Williams*, 490 U.S. 319, 328-29 (1989). A claim has no arguable basis in law if it is based on an indisputably meritless legal theory, "such as if the complaint alleges the violation of a legal interest which clearly does not exist." *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998) (citations omitted). A claim has no arguable basis in fact if "after providing the plaintiff the opportunity to present additional facts when necessary, the facts alleged are clearly baseless." *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998) (citing *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)).

"In analyzing the complaint, [the Court] will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (*per curiam*). "The issue is not whether the plaintiff will ultimately prevail, but

whether he is entitled to offer evidence to support his claim.  Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint."  *Id.* (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff must allege sufficient facts in support of its legal conclusions that give rise to a reasonable inference that Defendants are liable.  *Id.*; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  The factual allegations must raise Plaintiff's claim for relief above the level of mere speculation.  *Twombly*, 550 U.S. at 555.  If the complaint, taken as a whole, gives rise to a plausible inference of actionable conduct, Plaintiff's claim should not be dismissed.  *Id*. Furthermore, as Plaintiff proceeds *pro se*, the Court construes his complaint liberally in his favor. *See Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

### D.  Discussion.

#### 1.  Plaintiff's § 1983 claims.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law.  *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).  To prevail on a § 1983 claim, a plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution and laws of the United States.  42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988).  A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties.  *Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002) (*per curiam*).

### a. The Eleventh Amendment bars Plaintiff's § 1983 claims against Dr. Kwarteng, Sanchez, and Collier in their official capacities.

A suit against a state officer in his or her official capacity is effectively a suit against that state official's office. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). The Eleventh Amendment, however, bars claims for money damages against a state or state agency. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Aguilar v. Texas Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998). As such, an action for monetary damages against a state official in his or her official capacity is one against the state itself, and is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Fifth Circuit has extended the Eleventh Amendment immunity specifically to TDCJ officers and officials acting in their official capacities. *See Oliver*, 276 F.3d at 742 (the Eleventh Amendment bars a prisoner's suit for money damages against prison officials in their official capacities).

To the extent that Plaintiff sues the individual defendants (Dr. Kwarteng, Sanchez, and Collier) in their official capacities for monetary damages, those § 1983 claims are barred by the Eleventh Amendment. Thus, the undersigned recommends that Plaintiff's claims for money damages against the individual defendants in their official capacities be dismissed as barred by the Eleventh Amendment.

### b. Plaintiff's Eighth Amendment deliberate indifference claims against Sanchez and Dr. Kwarteng.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. An Eighth Amendment violation occurs when a prison official acts with deliberate indifference to an inmate's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429

U.S. 97, 106 (1976).  Deliberate indifference may be exhibited by prison doctors in their response to prisoners' needs, or when prison officials have denied an inmate prescribed treatment or have denied him access to medical personnel capable of evaluating the need for treatment.  *Id.* at 104-05.  A prison official acts with deliberate indifference if he or she knows that an inmate faces a "substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837; *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (*per curiam*).  "[A] prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious."  *Id.*

"Deliberate indifference is an extremely high standard to meet."  *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).  In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citations omitted).  Delay in treatment may be actionable under § 1983 only if there has been deliberate indifference and the delay results in substantial harm.  *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Although inadequate medical treatment may rise to the level of a constitutional violation, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances."  *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012) (citing *Gobert*, 463 F.3d at 346).  "Deliberate indifference encompasses only unnecessary and wanton

infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

   *i.* ***Plaintiff fails to allege a plausible deliberate indifference claim against Sanchez in his supervisory capacity.***

Plaintiff sues Sanchez, as a supervisor, in his individual and official capacity based on a theory of vicarious and *respondeat superior* liability.  (Doc. No. 27, pp. 55-56.)  However, "[p]ersonal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976)). It is well-established that a prison supervisor cannot be held liable for the misconduct of his or her subordinates. *See, e.g., Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987).  Indeed, there is no vicarious or *respondeat superior* liability for supervisors under § 1983. *See id.* at 303-04; *Snow v. City of El Paso, Texas*, 501 F. Supp. 2d 826, 835 (W.D. Tex. 2006) ("In a § 1983 action, a court cannot hold supervisory officials vicariously liable for the actions of their subordinates."); *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) (the acts of subordinates do not trigger individual § 1983 liability for supervisory officials).

Rather, "the misconduct of a subordinate must be affirmatively linked to the action or inaction of the supervisor." *Snow*, 501 F. Supp. 2d at 835 (internal quotations and citations omitted).  The Fifth Circuit has held that "[s]upervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." *See, e.g., Mouille v. City of Live Oak, Tex.*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins*, 828 F.2d at 303).  "Mere knowledge and acquiescence on a supervisor's part is insufficient to create supervisory liability under § 1983." *Doe v. Bailey*, No. H-14-2985, 2015 WL 5737666, at *9 (S.D. Tex. Sept. 30, 2015) (Werlein, J.) (citing *Iqbal*, 556 U.S. at 677).

Here, Plaintiff alleges that Sanchez failed to take any action to assist Plaintiff upon hearing Plaintiff complain to Capt. Pawley about being forced to move to the second floor despite his medical ground floor restriction.  (Doc. No. 27, pp. 54-55.)  Plaintiff's allegations, accepted as true, fail to suggest that Sanchez had any personal involvement in the decision to move Plaintiff to the second floor or otherwise implemented any policy resulting in Plaintiff's injuries.  Plaintiff, therefore, has failed to allege a plausible deliberate indifference claim against Warden Sanchez in his role as a supervisory official.  Accordingly, the undersigned recommends that Plaintiff's deliberate indifference claims against Sanchez be dismissed with prejudice as frivolous and/or for failure to state a claim for relief.

> ### ii.  *Plaintiff has stated a deliberate indifference claim against Dr. Kwarteng for moving Plaintiff to the second floor; however, Plaintiff has failed to state a claim against Dr. Kwarteng for inadequate medical treatment.*

Plaintiff alleges that Dr. Kwarteng was responsible for having Plaintiff moved to the second floor on December 29, 2021, even though Dr. Kwarteng was aware that: (1) Plaintiff had been medically restricted to ground-floor housing only; and (2) Plaintiff suffered from numerous physical injuries, including serious issues with his left leg, that made it difficult for him to walk and stand.  (Doc. No. 27, pp. 18-19.)  Plaintiff's allegations reflect that he fell down the stairs on January 4, 2022, when his left leg gave out on him.  *Id.* at 36, 39.

Plaintiff's allegations, accepted as true, suggest that Dr. Kwarteng acted with deliberate indifference to Plaintiff's serious medical needs by causing Plaintiff's transfer to a second-floor cell despite his ground-floor restriction on record and his knowledge of Plaintiff's physical infirmities.  Accordingly, the undersigned recommends that Plaintiff's deliberate indifference claim on the issue of moving Plaintiff to the second floor be retained against Dr. Kwarteng in his individual capacity.

Plaintiff further alleges that Dr. Kwarteng failed to provide him with adequate medical care by: (1) prescribing him with the anti-anxiety drug Cymbalta in November 2021, which caused Plaintiff to experience adverse side effects when taken in combination with certain pain medications; and (2) not providing Plaintiff any pain management or physical therapy on December 28, 2021, and instead referring Plaintiff to physical therapy.  (Doc. No. 27, pp. 33-34, 49-51.)  Plaintiff acknowledged, however, that Dr. Kwarteng followed policy and prescribed him "what the rule book says for him to prescribe [Plaintiff]."  *Id.* at 52.

Plaintiff's allegations, accepted as true, indicate that Dr. Kwarteng actively treated Plaintiff for anxiety and pain and has referred Plaintiff to physical therapy.   Plaintiff's complaints regarding Dr. Kwarteng's care, however, amount only to his disagreement over the course of treatment he has received for his anxiety and pain issues.  *See Whiting v. Kelly*, 255 F. App'x 896, 899 (5th Cir. 2007) (*per curiam*) ("Although [plaintiffs] clearly believe that they should undergo additional testing and drug therapies, such disagreement does not give rise to a constitutional claim.") (citations omitted).  Therefore, Plaintiff's disagreement with this course of treatment and dissatisfaction with the medical care afforded to him by Dr. Kwarteng on these issues are insufficient to establish a § 1983 claim for deliberate indifference.  *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001) ("Disagreement with medical treatment alone cannot support a claim under § 1983."); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) (plaintiff's claims that medical personnel misdiagnosed his illness, or that their treatment was unsuccessful, did not support a conclusion of deliberate indifference).

Accordingly, the undersigned recommends that Plaintiff's deliberate indifference claims regarding the medical treatment provided by Dr. Kwarteng be dismissed with prejudice as frivolous and/or for failure to state a claim for relief.

### c. *Plaintiff's three-week placement in restrictive housing does not constitute cruel and unusual punishment under the Eighth Amendment.*

Liberally construed, Plaintiff alleges that his constitutional rights were violated when, following his return to the McConnell Unit, he was placed in restrictive housing on Building 12's ground floor for three weeks even though he did not commit a disciplinary infraction.  (Doc. No. 27, pp. 43-47.)  Plaintiff acknowledged that Building 12 was also used to house transient inmates until new housing was found and that he was ultimately moved out of restrictive housing after his stay.  *Id.* at 45-47.

Plaintiff fails to identify any specific defendant who was responsible for his placement in restrictive housing for three weeks.  Furthermore, he does not complain of any specific conditions of his confinement in Building 12 or otherwise suggest his health deteriorated during his three-week stay in restrictive housing.  Plaintiff's short-term stay in restrictive housing does not constitute cruel and unusual punishment in violation of the Eighth Amendment.  *See Rodriguez-Cervantes v. Julian*, No. 5:12-CV-00196, 2014 WL 1744112, at *2 (N.D. Tex. Apr. 30, 2014) ("Placement in segregation for a mere nine days does not constitute cruel and unusual punishment.") (citing *Hernandez v. Velasquez*, 522 F.3d 556, 560-61 (5th Cir. 2008) (*per curiam*)).  In addition, "it is well established that a prisoner's placement in administrative segregation, without more, 'does not constitute a deprivation of a constitutionally cognizable liberty interest.'"  *Krieg v. Keeney*, No. 5:13-CV-243, 2014 WL 11513123, at *6 (N.D. Tex. Aug. 1, 2014), *aff'd*, 619 F. App'x 387 (5th Cir. 2015) (*per curiam*) (quoting *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995) (*per curiam*)).

Accordingly, the undersigned recommends that Plaintiff's constitutional claims attacking his three-week stay in restrictive housing be dismissed with prejudice as frivolous and/or for failure to state a claim for relief.

## 2. *Plaintiff's ADA/RA claims.*

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, under the RA, "[n]o qualified individual with a disability . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

"The RA is operationally identical to the ADA in that both statutes prohibit discrimination against disabled persons; however, the ADA applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private."  *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 WL 327508, at *3 (N.D. Tex. Jan. 26, 2015) (citing *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (*per curiam*)).  Courts utilize the same legal standards in analyzing claims under both the ADA and RA.  *See Borum*, 2015 WL 327508, at *3 (citing *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011)).  The undersigned, therefore, will analyze Plaintiff's ADA and RA claims as though they were raised as a single claim.

To establish a valid ADA claim, a plaintiff must show that (1) he is a qualified individual with a disability within the meaning of the ADA;[3] (2) he was excluded from participation or

---

[3] With respect to an individual, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A)).  "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).  Furthermore, "ADA regulations generally require an individualized determination of disability based on whether the condition 'substantially limits an individual in a major life activity,' that is, categorical exclusions do not necessarily exist in

denied meaningful access to services, programs, and activities, or that he was otherwise discriminated against by defendants; and (3) such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v. County of El Paso, Texas*, 118 F.3d 421, 428 (5th Cir. 1997).

Under the ADA, discrimination effectively means failure to provide a reasonable accommodation to the needs of the disabled person. *See Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004). The Fifth Circuit has held that a prison's failure to satisfy the reasonable accommodation requirement may constitute a denial of services or benefits as well as discrimination sufficient to satisfy the second and third prongs of the Title II ADA inquiry. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (*per curiam*) (quoting *Tennessee v. Lane*, 541 U.S. 509, 531 (2004)). "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015).

In the prison context, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCoy v. Texas Dep't of Crim. Just*., No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) (Jack, J.); *United States v. Georgia*, 546 U.S. 151, 156-57 (2006) (recognizing prisoner's allegations that defendant refused to provide a reasonable accommodation to a paraplegic inmate, "in such fundamentals as mobility, hygiene, medical

---

the ADA term 'disability.'" *Peña Arita v. County of Starr, Texas*, No. 7:19-CV-00288, 2020 WL 5505929, at *4 (S.D. Tex. Sept. 11, 2020) (Alvarez, J.) (citations omitted).

care," resulted in the disabled inmate suffering serious punishment "without penal justification" and supported claims under the ADA and RA).

On the other hand, the ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012) (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999) ("We do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'").  Thus, the ADA does not cover "the mere absence or inadequacy of medical treatment for a prisoner."  *See Whetstone v. Hall*, No. 4:17cv158-JMV, 2018 WL 522778, at *2 (N.D. Miss. Jan. 23, 2018)).  Instead, Plaintiff must show he was treated differently because of his qualified disability. *Nottingham*, 499 F. App'x at 376-77.

> ### a.  *Plaintiff cannot bring ADA/RA claims against Dr. Kwarteng and Sanchez in their individual capacities, and therefore, these claims should be dismissed.*

Plaintiff sues Dr. Kwarteng and Sanchez in their individual capacities with respect to his ADA/RA claims.  However, a plaintiff may not sue defendants in their individual capacities under the ADA.  *See Nottingham*, 499 F. App'x at 376, n.6 (noting that under the ADA, a plaintiff may not sue the defendants in their individual capacities); *Roberts v. Cooper*, No. 6:22cv102, 2022 WL 2442798, at *4 (E.D. Tex. Apr. 29, 2022).  Likewise, a plaintiff cannot sue a defendant in his individual capacity under the RA.  *See Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir. 1999); *Payne v. Sutterfield*, No. 2:18-CV-084, 2021 WL 3173902, at *3 (N.D. Tex. July 27, 2021).  Accordingly, the undersigned recommends that Plaintiff's ADA/RA claims against Dr. Kwarteng and Sanchez in their individual capacities by dismissed with prejudice as frivolous and/or for failure to state a claim for relief.

**b.  *The Court should retain Plaintiff's ADA/RA claims against Dr. Kwarteng, Sanchez, Collier, and the State of Texas in their official capacities.***

Plaintiff additionally brings his ADA/RA claims against the individual defendants in their official capacities and the State of Texas.  The ADA does not itself "prohibit suit against both the State and its agencies."  *Patrick v. Martin*, No. 2:16-CV-216, 2018 WL 3966349, at *5 (N.D. Tex. June 29, 2018) (citing 42 U.S.C. § 12131(1)(a)-(b)).  The Fifth Circuit has further held that state officers sued in their official capacities are proper defendants in suits brought under the ADA.  *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412-14 (5th Cir. 2004) ("Defendants have been sued in their official capacities and are therefore representing their respective state agencies (which are proper Title II defendants) for all purposes except the Eleventh Amendment.").

Construing the pleadings liberally and accepting Plaintiff's allegations as true, the Court finds that Plaintiff sufficiently shows that he suffers from physical impairments that greatly limit his daily life activities, and that he is a "qualified individual with a disability."[4]  *See Peña Arita v. County of Starr, Texas*, No. 7:19-CV-00288, 2020 WL 5505929, at *5 (S.D. Tex. Sept. 11, 2020) (Alvarez, J.) (in evaluating a motion to dismiss, the court explained that it could not say definitely whether the individual suffered a disability, however, the court's role was to "interpret Plaintiffs' complaint as a whole and grant Plaintiffs every reasonable inference to determine whether Plaintiffs state a plausible claim for relief").

Plaintiff's allegations further suggest he was subjected to discrimination based on Dr.

---

[4] At the *Spears* hearing, Plaintiff stated he was a "qualified individual with a disability," and that he was "bona fide, certified, verified disabled." (Doc. No. 27, p. 69.)  In addition to construing the pleadings liberally, the Court also reads the definition of "disability" broadly.  "The definition of 'disability' is broad and accommodating—an impairment that 'substantially limits' a major life activity need only reduce the disabled person's ability to perform a major life activity as compared to the general population."  *Peña Arita*, 2020 WL 5505929, at *4 (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590-91 (5th Cir. 2016)).

Kwarteng's action in sanctioning Plaintiff's move to the second floor, which defied the reasonable accommodation previously afforded him by his medical ground-floor restriction. *See Wright v. Texas. Dep't of Crim. Just.*, No. 7:13-CV-0116-O, 2013 WL 6578994, at*3-4 (N.D. Tex. Dec. 16, 2013) (holding that confinement in a prison is a service or program for ADA/RA purposes and safe housing is a reasonable accommodation). As a result of the removal of this reasonable accommodation, Plaintiff may have suffered unnecessary harm and punishment when he fell down the stairs a few days after being moved to the second floor. The undersigned finds, therefore, that Plaintiff has stated an ADA/RA claim.

At this early stage in the proceedings, the undersigned concludes that Plaintiff's ADA/RA claims should be retained against each individual defendant in his official capacity, as well as against the State of Texas. Further factual and legal development of this issue is necessary to determine whether Plaintiff is in fact a qualified individual with a disability, whether any of these defendants in their official capacities should be dismissed, or whether a state agency such as the TDCJ or the University of Texas Medical Branch (UTMB) should be substituted in place of the State of Texas.

### E. Recommendation.

For the reasons stated above and for purposes of § 1915A, the undersigned recommends that the Court **RETAIN**: (1) Plaintiff's Eighth Amendment deliberate indifference claim against **Dr. Kwarteng** in his individual capacity with regard to Plaintiff's move to the second floor against his ground floor restriction; and (2) his related ADA/RA claims against the **State of Texas** and **Dr. Kwarteng, Sanchez,** and **Collier** in their official capacities with regard to Plaintiff's move to the second floor against his ground floor restriction.

The undersigned recommends further that: (1) Plaintiff's § 1983 claims for money

damages against **Dr. Kwarteng, Jerry Sanchez,** and **Collier** in their official capacities be **DISMISSED** as barred by the Eleventh Amendment; and (2) Plaintiff's remaining § 1983 and ADA/RA claims against Defendants be **DISMISSED with prejudice** as frivolous and/or for failure to state a claim for relief.

### F.  Notice.

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **14 days** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within **14 days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

SIGNED on August 4, 2022.

MITCHEL NEUROCK
United States Magistrate Judge